

The following constitutes the
Memorandum Decision of the Court.
Signed August 24, 2017

_____
Roger L. Efremsky
U.S. Bankruptcy Judge

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| In re CFB LIQUIDATING CORPORATION, f/k/a CHICAGO FIRE BRICK CO., an Illinois Corporation, et al., | Case No. 01-45483 rle<br>Chapter 11<br>Jointly Administered |
| Debtors. | |

_____

**MEMORANDUM DECISION DENYING CONTINENTAL CASUALTY COMPANY'S
MOTION FOR LEAVE TO REFILE STATE COURT COMPLAINT
NAMING THE TRUSTEE AS DEFENDANT**

## I. Introduction

On May 8, 2017, Continental Casualty Company ("Continental") filed a complaint in state court in Illinois naming Barry A. Chatz, the court appointed liquidating trustee for the CFB/WFB Liquidating Trust (the "Trustee" and the "Trust") as the defendant. The complaint sought declaratory relief regarding

*Memo. Decis. Barton* -1-

Continental's insurance coverage obligations under policies issued by Continental to Debtors (the "Policies").

On May 17, 2017, the Court issued an order to show cause asking why Continental and its counsel should not be held in contempt for filing the complaint without the permission of this Court in violation of the *Barton* doctrine. In response to the order to show cause, Continental dismissed the complaint.

On June 14, 2017, Continental filed the current motion (the "Motion") seeking permission to file its Complaint for Declaratory Judgment for Non-Coverage in Illinois state court. Docket no. 571, Ex. A (the "Coverage Complaint"). The Trustee has filed opposition. Docket no. 579. Continental has filed a reply. Docket no. 581. The matter has been fully briefed and argued. For the following reasons, the Court denies the Motion.

## II. Background

The Court assumes the parties are familiar with the relevant background facts necessary to the resolution of the Motion. The Court incorporates here by reference Section II of its summary judgment decision in Adversary Proceeding No. 15-4136 (the "Adversary Proceeding"). AP Docket no. 44, p. 2-9. However, certain matters bear repeating for the sake of context and certain matters pertain only to this Motion.

### A. Continental's Proof of Claim

This chapter 11 case was filed in 2001 and the Debtors confirmed the Joint Chapter 11 Plan of CFB Liquidating Corporation f/k/a Chicago Fire Brick Company, and WFB Liquidating Corporation f/k/a Wellsville Fire Brick Company, as Modified, in 2012 (the "Plan" and the "Confirmation Order"). Docket nos. 421

*Memo. Decis. Barton*                    -2-

and 470. Continental filed a proof of claim prior to confirmation of the Plan, designated as claim no. 1689-1 on the claims register (the "Proof of Claim"). The Proof of Claim states it is "contingent and unliquidated" and is based on a "potential right of setoff" and "confirmation of the pending plan may leave Continental without the participation of the Debtor's other insurance carriers" and Continental "may be asked to pay some or all of others' share of payments due for defense of claims against the Debtor." Continental demanded performance of Debtors' "reciprocal obligations" under its insurance policies and, "to the extent such obligations give rise to a 'Claim' within the meaning of §101(5) of the Bankruptcy Code, Continental hereby demands payment on its claim." Proof of Claim.

**B. The Plan**

The Plan was designed to provide a comprehensive mechanism to resolve Asbestos Claims - as defined in the Plan - in an efficient, centralized, and equitable manner. As Bankruptcy Code §1123(b)(3) permits, certain sections of the Plan were negotiated to provide a structure by which Continental would provide its insurance coverage to pay Asbestos Claims that triggered its Policies (the "Tendered Claims").

The Debtors settled with their insurers other than Continental and these settlement agreements were incorporated into the Plan. Because the Debtors did not have a similar settlement with Continental, the Plan categorizes the Debtors' insurers. First, the Plan defines a "Non-Settling Insurer" as "any insurer against which the Liquidating Trust holds a Retained Cause of Action and/or that has not settled its potential

Case: 01-45483   Doc# 586   Filed: 08/24/17   Entered: 08/25/17 08:14:59   Page 3 of 39

liability under any Insurance Policy, *other than Continental*."
Plan, §1.59 (emphasis added). Second, the Plan defines "Settling
Insurers" as "collectively, Hartford, Bituminous, ACE, Safety
National and, solely to the extent that the Debtors enter into an
agreement prior to the Effective date, Continental." Plan §1.78.
Because it did not enter into a settlement agreement with the
Debtors prior to the Effective Date, Continental is in a category
by itself; it is neither a Settling Insurer nor a Non-Settling
Insurer. Instead, it agreed to resolve its coverage obligations
according to the procedures in §8.3 of the Plan.

The Plan established the Liquidating Trust and appointed the
Trustee to liquidate the Debtors' assets and distribute the
proceeds according to the Plan, the Liquidating Trust Agreement,
and the Trust Distribution Procedures (the "TDP"). Plan, §8.1-
8.2. The holders of Allowed Asbestos Claims are beneficial owners
of the Trust. Docket no. 408-1, §2.5.

The powers and duties of the Trustee include performing the
Debtors' and the Trust's obligations under the Plan; resolving
the "Retained Causes of Action" and any other litigation
involving the Debtors, the Trust or the Plan. Plan, §8.2. Section
1.71 defines the "Retained Causes of Action" as "all causes of
action owned by the Estates, including but not limited to any and
all Claims, causes of action or rights relating to any Insurance
Policies, any other Claims for contribution or indemnification
from any third party, and any other Claim or cause of action
against any issuer of an Insurance Policy." Section 1.54 defines
"Insurance Policy" as "any policy of insurance or indemnification
issued by an insurance company in which the Debtors hold an

*Memo. Decis. Barton*                    -4-

ownership or beneficial interest, whether known or unknown or under which either of the Debtors is an insured."

Section 8.3 is entitled "Handling of Claims for which Continental May Have Financial Responsibility." This section was extensively discussed in section IV of the Court's summary judgment decision and that discussion is incorporated herein by reference. AP Docket no. 44, p. 13-22.

In short, the Trust agreed to submit Proposals to Continental - including supporting evidence using a court approved proof of claim form - stating the liquidated value of each Asbestos Claim for which it contended Continental was responsible. Continental had 90 days to respond to these Proposals. The Trust was permitted to submit only 660 claims per quarter and 2,500 per calendar year. During the 90-day period after receipt of a Proposal, Continental could seek additional information from the Trustee and the Claimant, and "shall inform the Liquidating Trust in writing whether it accepts or rejects the terms of the Proposal." Plan, §8.3.

Section 8.3(a) provides that if Continental accepted a Proposal, it "shall pay" its allocated percentage of the liquidated value of the Tendered Claims or any different amount agreed upon with the Trustee.

Section 8.3(b)(i)-(iii) describe the three ways the Trust and Continental agreed to proceed if Continental rejected a Proposal: (i) the Trust could abandon seeking coverage from Continental; (ii) if the Trust disputed the rejection, it could pay the Claim without Continental's consent and reserved the right to recover against Continental; and (iii) the Trust could

*Memo. Decis. Barton*                    -5-

pay that portion of a Claim it contended was allocable to a
Settling Insurer and cede the Claim to the claimant to first
pursue a judgment against the Debtors and then pursue coverage
from Continental for its allocated percentage of such a judgment.

To the extent Continental had coverage defenses, the Plan
provided it with a way to assert them by rejecting any Tendered
Claim as provided above. In addition, §8.3(c) provides that "in
any suit brought pursuant to §8.3," Continental is entitled to
assert all defenses available to Continental in the absence of
the Plan, including a defense that the Debtors are not liable
with respect to a Claim.[1]

Article 12 is entitled "Retention and Prosecution of
Claims." Section 12.1 provides that, subject to §16.19, Debtors
assigned the Retained Causes of Action to the Trustee to
investigate, prosecute, settle or compromise. Section 12.1 also
provides that, subject to §8.3, the Retained Causes of Action
include all rights and Claims under any Insurance Policy
including Continental's Policies.

Article 15 covers retention of jurisdiction. Section 15.1
provides that the Court will retain jurisdiction as is legally
permissible under applicable law, including under Bankruptcy Code
§105(a) and §1142, and jurisdiction to enforce all Retained
Causes of Action over which the Court otherwise has jurisdiction.
Plan, §15.1.

Section 15.3 also provides the Court will retain

---

[1] It is not entirely clear whether §8.3(c) addresses only
disputes between Continental and third parties, or includes
disputes between Continental and the Trust.

*Memo. Decis. Barton*                    -6-

jurisdiction after confirmation to determine disputes concerning the allowance of Claims, except as otherwise provided in the TDP or §8.3; and to determine causes of action in which the Trustee seeks to recover assets or otherwise pursue rights pursuant to the provisions of the Bankruptcy Code. Plan, §15.3.

Section 16.19 is entitled "Insurance Neutrality." It provides that:

> [N]othing in the Confirmation Order, the Plan, the TDP, or any settlement agreement shall in any way operate to impair ... either (a) an insurers' [sic] legal, equitable or contractual rights, ... including rights and arguments as to jurisdiction and venue, except to the extent ... expressly impaired or limited in a settlement agreement ..., or (b) the legal, equitable or contractual rights of ... the Liquidating Trust against the Debtor's Insurers, ... except: (i) to the extent that such rights are expressly impaired or limited in a settlement agreement ... and/or (ii) as expressly provided in §7.3 herein. [2]

Section 16.20 is entitled "Judgment Reduction." By its terms, this section only applies to a dispute between a Non-Settling Insurer and a Settling Insurer.

**C. Continental's Participation Pre-Confirmation**

Counsel for Continental first appeared in this case in September 2009. Docket no. 250. Over the next three years, Debtors negotiated with Continental and their other insurance carriers to confirm the consensual Plan.

**1. 2009 – 2010**

On November 5, 2009, Debtors filed their First Amended Chapter 11 Plan and First Amended Disclosure Statement. Docket nos. 254-255. Continental filed an objection to the First Amended

---

[2] Section 7.3 covers the releases granted upon confirmation of the Plan.

Case: 01-45483   Doc# 586   Filed: 08/24/17   Entered: 08/25/17 08:14:59   Page 7 of 39

Disclosure Statement. Docket no. 262.

On June 29, 2010, Debtors' counsel filed a status report for a July 6, 2010 status conference. Docket no. 278. The status report explained that while Debtors had contemplated proceeding to a contested confirmation hearing in July or August of 2010, the Debtors had instead "engaged in substantial negotiations on plan amendments that would resolve Continental's objections on the merits." Docket no. 278, p. 5:4-10. These negotiations resulted in a "comprehensive claim review process that will preserve Continental's right to participate in the determination of any Asbestos Claims it is asked to pay while also permitting for the orderly liquidation of the claims." Docket no. 278, p. 5:13-25.

On July 2, 2010, Debtors filed the Second Amended Chapter 11 Plan and Second Amended Disclosure Statement. Docket nos. 280, 283. On August 9, 2010, Debtors' excess insurer, Safety National, filed an objection to the Second Amended Disclosure Statement. Docket no. 288. Debtors and Hartford Accident and Indemnity Company filed a joint response to Safety National's objection. Docket no. 292. With respect to Continental, they stated that Debtors had engaged in "extensive arms-length negotiations" with Continental and it "remains an 'unsettled carrier' that continues to reserve all of its rights to dispute any and all claims for insurance coverage. But it has reached an agreement regarding the manner in which claims will be resolved, how the claims will be tendered to it, and how it will respond to claims if and when it receives them." Docket no. 292, p. 2:22-3:7. On September 9, 2010, the Court entered an order approving the Second Amended

Case: 01-45483   Doc# 586   Filed: 08/24/17   Entered: 08/25/17 08:14:59   Page 8 of 39

Disclosure Statement. Docket no. 307.

**2. 2011 - 2012**

Despite approval of the Second Amended Disclosure Statement in 2010, the confirmation process was delayed in order to resolve the objection of Safety National. In April 2012, the case again began to move toward confirmation when the Debtors filed their Joint Chapter 11 Plan and Disclosure Statement. Docket nos. 407 and 408. In a joint status report filed at this time, Debtors and Safety National stated that the Debtors had been informed that these versions of the Plan and Disclosure Statement were acceptable to Continental. Docket no. 406, p. 2:21-26.[3]

On June 1, 2012, Debtors filed the final version of their Joint Disclosure Statement which the Court then approved (Docket no. 422) and the final version of the Plan that was ultimately confirmed in September 2012. Docket nos. 421 and 470. These final versions are substantially the same as those referred to in the April status report.

**D. The Adversary Proceeding**

**1. The First Amended Complaint**

Between May 2015 and September 2015, the Trust submitted 249 Trust Claims to Continental with a liquidated value sufficient to exhaust Continental's coverage. When Continental had not responded when the 90 days had run from the September 2015 tender, the Trust sued Continental for declaratory relief and breach of contract (the "Adversary Proceeding"). The Trust's

---

[3] Each of these status reports was served on Continental's counsel. Docket nos. 278, 293, 406. The Court assumes Continental would have spoken if these statements were inaccurate.

Case: 01-45483   Doc# 586   Filed: 08/24/17   Entered: 08/25/17 08:14:59   Page 9 of 39

First Amended Complaint asked for declaratory relief regarding the interpretation of the Plan and damages for breach of the Plan and the Policies. The Trust also sought extra-contractual damages for Continental's alleged vexatious and unreasonable conduct as an insurer under Illinois law (the "§155 Issues"). AP Docket no. 15, First Amended Complaint.[4] The First Amended Complaint alleged that the Trust had tendered to Continental Asbestos Claims that triggered Continental's policies, and when Continental did not comply as it had agreed to do - by accepting and paying, or by rejecting, or by asking for more information within 90 days - Continental had breached its contractual obligations under the Plan and under the Policies. The prayer sought $2.5 million breach of contract damages and a declaration that Tendered Claims exceeding $2.5 million triggered coverage under the Policies and Continental was obligated to pay its Policy limits, plus it was obligated to pay penalties pursuant to §155.

### 2. Continental's Answer and Counterclaim

Continental's Answer generally and specifically denied the allegations of the First Amended Complaint and stated eighteen affirmative defenses, many of which raised coverage issues. AP Docket no. 19. Its Counterclaim alleged that in its "purported tenders" the Trust had "refused to submit any contended percent

---

[4] Under 215 ILCS 5/155, if an insurer vexatiously delays or rejects a legitimate claim, it must bear the expense resulting from the insured's efforts to prosecute the claim, including reasonable attorney fees. Verbaere v. Life Ins. Co. of America, 226 Ill.App.3d 289 (1992). The purpose of §155 is to discourage the insurer from using its superior financial position to profit at the insured's expense. Valdovinos v. Gallant Ins. Co., 314 Ill.App.3d 1018, 1022 (2000).

*Memo. Decis. Barton*                    -10-

allocation between Continental and the trust fund from the insurance settlements as required by the Plan" and the Trust had "failed to comply" with a condition precedent in the Plan. AP Docket no. 19, ¶13-14. Continental sought a declaration that §8.3 required the Trust to so allocate, and precluded a contention that Continental's allocated percentage was 100% of the liquidated value of any Tendered Claim. AP Docket no. 19, ¶18.[5]

### 3. The Trust's Answer to the Counterclaim

The Trust's Answer to the Counterclaim alleged that Continental had not questioned the validity or liquidated value of any of the Tendered Claims and that the time period within which to do so, or to seek additional information, had passed with respect to hundreds of Tendered Claims. AP Docket no. 20.

### 4. The Summary Judgment and §155 Briefing

At the first Adversary Proceeding status conference on May 3, 2016, referring to the allocation issue, Continental's counsel stated, if the Court "says that the allocated percentage means 100%, then the case is over, right? Because then that is effectively saying we have to pay everything, and so *we pay everything*." AP Docket no. 30, Hr'g Tr. (May 3, 2016) p. 21:19-23, Raymond J. Tittman speaking (emphasis added). The Trustee's counsel asked the Court to set a trial date, but Continental's

---

[5] Continental stated in its Answer and Counterclaim that the Trust's claims for relief were not core and it did not consent to entry of final judgment by this Court. AP Docket no. 19, ¶4. The Court disagreed and stated so in the summary judgment ruling. AP Docket no. 44, n.2. The Court acknowledged that to the extent the claims were non-core, it had made proposed findings of fact and conclusions of law for the district court to review.

Case: 01-45483    Doc# 586    Filed: 08/24/17    Entered: 08/25/17 08:14:59    Page 11 of 39

counsel urged the Court to instead set a briefing schedule for a summary judgment motion that he argued would resolve the entire case. Continental prevailed on this and the Court set a briefing schedule. AP Docket no. 26.

Continental then moved for summary judgment on paragraphs 18(a)-(d) of its Counterclaim. AP Docket no. 27. The motion was fully briefed by both sides. AP Docket nos. 32-37. In November 2016, the Court ruled against Continental on its interpretation of the Plan. AP Docket no. 44.[6]

The Court held a status conference on December 6, 2016 to address the remaining §155 Issues: whether Continental had engaged in vexatious and unreasonable conduct and the appropriate remedy if the Court found that it had. The Trustee's counsel requested a trial date for the §155 issues. AP Docket no. 77, Hr'g Tr. (Dec. 6, 2016) p. 3:2-8. Counsel for Continental disagreed, stating there was nothing left to try. Referring to the summary judgment ruling, Continental's counsel said:

> You decided that issue adverse to us and we think it did decide the case . . . our view is that we're ready to enter judgment in whatever procedural manner you would like, but I just don't see that there's anything left to try. You know we put up our best argument and we didn't win, but I think the issue has been decided.

AP Docket no. 77, Hr'g Tr. (Dec. 6, 2016) 3:10-20.

Referring to the Trustee's request for extra-contractual damages under §155, Continental's counsel stated:

> [W]hat you'd need is you'd have to enter a judgment, which I think we could do at this time, frankly. I think we could

_____

[6] By this time, there were more than 1,500 Tendered Claims with a liquidated value of more than $8 million. AP Docket no. 44, p. 7-9.

Case: 01-45483    Doc# 586    Filed: 08/24/17    Entered: 08/25/17 08:14:59    Page 12 of 39

> stipulate to enter a judgment because I think we've lost our
> breach of contract argument, but I think that we'd have to
> enter that judgment and then they'd have to [indecipherable]
> tax costs, which Illinois allows them to do under certain
> circumstances.

AP Docket no. 77, Hr'g Tr. (Dec. 6, 2016) p. 7:10-19.

Continental's counsel also suggested the parties ought to "get together and resolve it" but they had not yet had a chance to do that. AP Docket no. 77, Hr'g Tr. (Dec. 6, 2016) p. 7:22-8:2. The Court continued the status conference to December 12, 2016 to allow the parties to discuss the next steps.

At the December 12, 2016 status conference, counsel for both parties explained they had agreed to brief whether the Trustee could make the requisite showing for recovery of extra-contractual damages under §155 and the Court did not need to set a trial date. The Trustee's counsel explained:

> Mr. Tittman isn't going to seek entry of a judgment right
> now, because we had talked about trying to enter an agreed
> judgment on the insurance part, the coverage part of the
> case, because we only want one appeal and he doesn't want
> his time to appeal to run on that.

AP Docket no. 75, Hr'g Tr. (Dec. 12, 2016) p. 6:13-18.[7]

With the parties' agreement, the Court set a briefing

_____

[7] Continental's counsel restated this position in its opposition to the §155 Motion, where the argument was that Continental had not caused unnecessary delay in the litigation. "I acknowledged that the Trustee had prevailed and consequently I suggested that, as predicted, the Court's Order did indeed resolve the issues in dispute. The Trustee's counsel sought a trial but I advised that we had already lost and judgment should be entered against Continental. I also acknowledged that the Trustee had a right to seek fees and a penalty under 215 ILCS 5/155 but that a judgment need not be delayed on that account, and that the expense of a trial would not be necessary." AP Docket no. 59, Declaration of Raymond J. Tittman, ¶18-19.

Case: 01-45483    Doc# 586    Filed: 08/24/17    Entered: 08/25/17 08:14:59    Page 13 of
39

schedule for the parties to address the §155 Issues (the "§155 Motion"). AP Docket no. 48.

### E. Continental's Efforts to Delay the §155 Motion

Briefing on the §155 Motion was complete as of February 15, 2017, and the initial hearing was set for March 7, 2017. AP Docket nos. 52-54, 57-59, 63-65, 66. However, on February 27, 2017, the Court moved the initial hearing to March 27, 2017. The Court anticipated issuing its ruling shortly after the March 27 hearing. Starting on March 20, Continental took the following steps relevant to the resolution of the §155 Motion and relevant to this Motion:

### 1. Ex Parte Application

On March 20, 2017, Continental filed an Ex Parte Application for Court Approval to File the Declaration of Raymond J. Tittman (the "Ex Parte Application"). AP Docket no. 69. By the Ex Parte Application, Continental sought to raise - for the first time - an argument that there were factual issues regarding the merits of the Tendered Claims. The Trust filed opposition to the Ex Parte Application. AP Docket no. 71. On March 29, 2017, the Court denied the Ex Parte Application. AP Docket no. 73. On March 27, 2017, the Court entered an order continuing the hearing on the §155 Motion to May 31, 2017. AP Docket no. 70.

### 2. State Court Complaint and Letter

On May 10, 2017, Continental's new counsel docketed a letter to the Court (the "Letter"). AP Docket no. 83.[8]  The Letter

_____

[8] In the Letter, counsel from Duane Morris LLP says the firm was "recently retained." This may explain, but does not excuse, some of the apparent misapprehension of the history of this case.

*Memo. Decis. Barton*                    -14-

advised the Court that Continental had filed the state court complaint on May 8, 2017, and that "significant insurance coverage issues have emerged as to whether the tendered claims 'trigger' the Continental policies," Continental had "newly-discovered evidence" showing that "any exposure" would have occurred years prior to the inception of Continental's policies,[9] there was "no evidence" that the claimants were diagnosed with an asbestos related disease or sickness during its policy periods so "no coverage is available" for the Tendered Claims. The Letter continued in this vein, concluding "in light of these new important and significant developments and our recent involvement in this case," the Court should set a status conference "so we can more fully advise the Court of these new developments." AP Docket no. 83.

### 3. Motion to Stay and Motion to Abstain

On May 10, 2017, Continental filed a Motion to Stay or Abate the Hearing and Further Proceedings on the §155 Motion (the "Motion to Stay"). AP Docket no. 84. The Motion to Stay is supported by a Declaration of Raymond J. Tittman. AP docket no. 89. In this Declaration, Mr. Tittman states his office "recently discovered" evidence that Debtor Chicago Fire Brick did not sell asbestos containing products after 1972 and "this evidence" meant that there was no coverage for the Tendered Claims. Continental also asked for a hearing on shortened time on the Motion to Stay or a continuance of the hearing on the §155 Motion. AP Docket no.

---

[9] By the terms of the TDP, exposure had to have occurred prior to 1980.

*Memo. Decis. Barton*                    -15-

85. In the Motion to Stay, Continental argued that the §155 Issues were not ripe, its coverage obligations had not been determined, and the Court did not have jurisdiction to decide the coverage issues.

The Trustee filed an objection to the Motion to Stay and to the request for a hearing on shortened time. AP Docket no. 93. The Trustee argued, among other things, that the "recently discovered evidence" had been given to Continental's counsel in October 2009 and Continental should be estopped from pursuing its efforts to derail the resolution of the §155 Motion. The Court denied Continental's request for a hearing on shortened time. AP Docket no. 94.

On May 10, Continental also filed a Motion to Abstain and Remand from Insurance Coverage Issues, with a notice of hearing for June 15, 2017 (the "Motion to Abstain"). AP Docket nos. 86-87. The Court later instructed Continental to withdraw the Motion to Abstain and on May 30, 2017, Continental withdrew its notice of hearing. Docket no. 103.

### 4. Orders to Show Cause

In response to the Letter, which the Court viewed as an improper ex parte contact, and the filing of the state court complaint, which the Court viewed as a violation of the *Barton* doctrine, on May 17, 2017, the Court issued two orders to show cause directed at Continental and its counsel. AP Docket nos. 95 and 96. These were set for hearing on June 15, 2017.[10]

---

[10] Continental withdrew the Letter on May 22, 2017. AP Docket no. 100.

*Memo. Decis. Barton*                    -16-

The Court also continued the hearing on the §155 Motion to June 15, 2017. On June 14, Continental filed this Motion seeking permission to sue the Trustee in state court. At the June 15 hearing, the Court ordered supplemental briefing on the §155 Motion and discharged the orders to show cause.[11]

## III. Discussion

### A. The *Barton* doctrine

The *Barton* doctrine provides that no suit may be brought against a receiver without leave of the receiver's appointing court. Barton v. Barbour, 104 U.S. 126, 136-37 (1881) ("[W]hen the court of one State has ... property in its possession for administration as trust assets, and has appointed a receiver to aid it in the performance of its duty by carrying on the business to which the property is adapted ... a court of another State has not jurisdiction, without leave of the court by which the receiver was appointed, to entertain a suit against him ....").

The Ninth Circuit recognizes that the *Barton* doctrine extends to bankruptcy trustees as well as receivers and to liquidating trustees such as the Trustee in this case. Beck v. Fort James Corp. (In re Crown Vantage, Inc.), 421 F.3d 963, 970 (9th Cir. 2005) ("We join our sister circuits in holding that a party must first obtain leave of the bankruptcy court before it initiates an action in another forum against a bankruptcy trustee or other officer appointed by the bankruptcy court for acts done in the officer's official capacity.") (Hereafter, Crown Vantage).

---

[11] Briefing on the §155 Motion is complete as of August 10, 2017 and the matter is under submission.

*Memo. Decis. Barton*                     -17-

The Ninth Circuit also pointed out that a confirmed plan operates as a final judgment and to raise identical issues in a different forum in contravention of the liquidating procedure approved in a plan is an impermissible collateral attack on a confirmed plan. _Crown Vantage_, 421 F.3d at 972-73.

### B. The _Barton_ Doctrine Applies Here

Continental argues that the _Barton_ doctrine is limited to suits seeking damages. This is not correct. See <u>Curry v. Castillo (In re Castillo)</u>, 297 F.3d. 940, 945 (9th Cir. 2002) (without leave of the bankruptcy court, _no suit_ may be maintained against a trustee for actions taken in the administration of the estate (emphasis added)); <u>McIntire v. China MediaExpress Holdings, Inc.</u>, 113 F.Supp.3d 769, 773-74 (D. S.D.N.Y. 2015) (rejecting insurers' argument that _Barton_ doctrine only applied to suits seeking damages).

Continental next argues that _Barton_ doctrine does not apply to the Coverage Complaint because it seeks only declaratory relief regarding the "critical question of whether there is coverage" under its Policies and it is simply a "suit at common law" that raises a claim that did not arise from the bankruptcy case, was not resolved in the claims allowance process, and thus is not core. For this proposition, Continental refers to <u>Stern v. Marshall</u>, 564 U.S. 462 (2011) but cites no authority for such a blanket exclusion of its vaguely described <u>Stern</u> claim from the reach of the _Barton_ doctrine. In fact, the question of whether a foreign action affects the bankruptcy estate is to be addressed to the bankruptcy court as an initial matter. <u>Crown Vantage</u>, 421 F.3d at 973, n.6.

_Memo. Decis. Barton_        -18-

The *Barton* doctrine clearly applies to the Coverage Complaint and Continental needs this Court's permission before it can sue the Trustee in state court.

**C. Should Permission to Sue the Trustee be Granted?**

In <u>Kashani v. Fulton (In re Kashani)</u>, 190 B.R. 875 (9th Cir. BAP 1995), chapter 11 debtors asked for permission to sue their chapter 11 trustee for allegedly mishandling their estate. The bankruptcy court denied their request when they failed to file a proposed complaint as the court had ordered. The BAP considered whether the bankruptcy court had abused its discretion by requiring the debtors to show the complaint they proposed to file and by refusing to grant permission to sue the trustee in another court when they failed to do so. The BAP held that the bankruptcy court did not abuse its discretion when it required the debtors to file a proposed complaint; the requirement ensured that enough information was given to the court to understand the grounds upon which the debtors wished to proceed. The bankruptcy court is in the best position to know whether the proposed suit involves claims that may have already been litigated in the bankruptcy court or may lack merit. <u>Id.</u> at 886-87. The BAP then described five factors to consider in deciding whether to grant permission to proceed in a foreign court. <u>Id.</u> at 887.

> By conducting such an analysis, the bankruptcy court will determine whether the issues raised in the proposed complaint affect solely the administration of the bankruptcy estate and should be heard by the bankruptcy court. The bankruptcy court will also be able to determine whether the claims have been previously decided on the merits and should not be pursued by the proposed plaintiffs on the basis of res judicata or collateral estoppel.

<u>Id.</u>

These factors were cited with approval in <u>Crown Vantage</u>, 421

Case: 01-45483   Doc# 586   Filed: 08/24/17   Entered: 08/25/17 08:14:59   Page 19 of 39

F.3d at 976, and were applied in <u>Blixseth v. Brown (In re</u>
<u>Yellowstone Mountain Club</u>), 841 F.3d 1090, 1095 (9th Cir. 2016)
(*Barton* doctrine applied to claims against creditor's committee
member because committee members are statutorily obliged to
perform tasks related to the administration of the estate,
lawsuit would seriously interfere with complicated bankruptcy
proceedings). <u>See also</u> <u>Matter of Linton</u>, 136 F.3d 544, 545 (7th
Cir. 1998) (pointing out that if a trustee is burdened with
having to defend against suits by litigants disappointed by his
actions on the court's behalf, his work for the court will be
impeded, and if the case is still open, the threat of a trustee
being distracted or intimidated is very great).

The factors described in <u>Kashani</u> are:

(1) whether the acts or transactions alleged in the proposed
complaint relate to the carrying on of the business connected
with the property of the bankruptcy estate.

(2) whether the claims in the proposed complaint pertain to
actions of the trustee while administering the estate.

(3) whether the claims involve the trustee acting within the
scope of his or her authority under the statute or orders of the
bankruptcy court so that the trustee is entitled to quasi-
judicial or derived judicial immunity.

(4) whether the proposed plaintiff is seeking to surcharge
the trustee; that is, a judgment against the trustee personally.

(5) whether the claims involve breach of a fiduciary duty
either through negligent or willful misconduct.

190 B.R. at 886-87.

One or more of these factors may be a basis for the

*Memo. Decis. Barton* -20-

bankruptcy court to retain jurisdiction over the claims and will assist the court in determining which claims should be tried in another forum. Id.

### D. Application of the Kashani Factors

#### 1. Whether the acts in the proposed complaint relate to the carrying on of the Debtors' business.

This factor involves the statutory exception to the *Barton* doctrine in 28 U.S.C. §959(a). It provides:

> Trustees, receivers or managers of any property, including debtors in possession, may be sued, without leave of the court appointing them, with respect to any of their acts or transactions in carrying on business connected with such property.

This exception only applies to acts or transactions in conducting a debtor's business in the ordinary sense of the words or in pursuing that business as an operating enterprise. It does not apply to suits against trustees for administering or liquidating a bankruptcy estate. Crown Vantage, 421 F.3d at 972.

The Debtors stopped operating their business in 2002 when they sold their assets and have conducted no business since that sale closed in early 2003. Docket no. 422. Continental argues that §959(a) applies here because from 2003 onward, the Debtors – through their responsible individual – continued to "liquidate" their insurance policies as the primary assets of the estate, and the same liquidation was pursued by the Trustee following his appointment in 2012. As such, Continental contends this sheer passage of time shows that the Trustee is conducting the Debtors' pre-confirmation business.

This argument strains credulity. The Debtors' business - in the ordinary sense of the word - was manufacturing and

Case: 01-45483   Doc# 586   Filed: 08/24/17   Entered: 08/25/17 08:14:59   Page 21 of 39

distributing refractory products. The Debtors' business did not become an operating enterprise engaged in the business liquidating insurance policies after the operating assets were sold. Between 2003 and 2012, Debtors worked to settle with their insurers and to confirm the Plan. The Debtors did not pay Asbestos Claims until after the Plan had been confirmed and the order allowing Asbestos Claims had been entered.

The Ninth Circuit's statement regarding the liquidating trustee in <u>Crown Vantage</u> is instructive here:

> [T]he Liquidating Trustee was not operating the business previously conducted by the debtor; he was liquidating the assets of the estate. This is precisely the type of activity that the *Barton* doctrine was designed to protect. Thus, the limited exception to the *Barton* doctrine contained in §959(a) does not apply.

421 F.3d at 972.

Because this exception does not apply, the Court's task is to determine whether permission to allow the Coverage Complaint to proceed in state court is an appropriate exercise of its discretion.

### 2. Whether the claims in the proposed complaint pertain to actions of the Trustee while administering the estate.

Does the Coverage Complaint raise issues regarding the actions of the Trustee in administering the estate? "By asking this question, the court may determine whether the proceeding is a core proceeding or a proceeding which is related to a case or proceeding under Title 11." <u>Kashani</u>, 190 B.R. at 886.

The Plan, the Confirmation Order, the Liquidating Trust Agreement and the TDP determine the actions that the Trustee is to take and the assets of the estate he is to administer. As

*Memo. Decis. Barton*                    -22-

described above, under §8.1, all property of Debtors was transferred to the Liquidating Trust, and the Trustee, as successor to the Debtors, was to liquidate Trust Claims pursuant to terms of the TDP. Plan, §8.1. See also, Docket no. 408-1, Liquidating Trust Agreement, §2.2. The Trustee's powers and duties include prosecuting the Retained Causes of Action and pursuing any other litigation involving the Debtors, the Liquidating Trust, or the Plan, and taking any other actions necessary or appropriate to implement or consummate the Plan and operate the Liquidating Trust. Plan, §8.2.

The "administration of the estate" includes pursuit of the insurance coverage Continental agreed to provide in the manner it agreed to provide it by the Plan. Obtaining payment from Continental from the coverage provided by its Policies using the procedures in §8.3 was undeniably the Trustee's duty. Because the Plan is a binding contract affecting Continental's coverage obligations, it was also Continental's duty to perform as it had agreed to do. When the dispute with Continental arose, it was also the Trustee's duty to sue Continental if this was necessary in order to resolve the dispute.

Against this backdrop, the Court considers whether the Coverage Complaint raises a core claim or a claim that is related to this chapter 11 case.

28 U.S.C. §1334(b) gives federal district courts subject matter jurisdiction over all civil proceedings arising under title 11, or arising in, or related to cases under title 11. 28 U.S.C. §157(a) allows district courts to refer any of these proceedings to bankruptcy courts. 28 U.S.C. §157(b)(1) provides

Case: 01-45483   Doc# 586   Filed: 08/24/17   Entered: 08/25/17 08:14:59   Page 23 of 39

bankruptcy courts authority to make binding decisions only in core proceedings that arise under or arise in a case under title 11. A bankruptcy court may hear a non-core proceeding that is otherwise related to a case under title 11 and submit proposed findings of fact and conclusions of law to the district court which will enter any final order or judgment for de novo review. 28 U.S.C. §157(c)(1). However, with the consent of all parties, a bankruptcy court may hear and determine, and enter final orders and judgments subject to review under §158. 28 U.S.C. §157(c)(2).

Core proceedings are listed in 28 U.S.C. §157(b)(2). They include but are not limited to matters concerning the administration of the estate, §157(b)(2)(A); and other proceedings affecting the liquidation of the assets of the estate, §157(b)(2)(O). "A determination that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution may be affected by State law." 28 U.S.C. §157(b)(3).

A bankruptcy court's post-confirmation subject matter jurisdiction over matters that are related to a bankruptcy case is analyzed under the test stated in Montana v. Goldin (In re Pegasus Gold Corp.), 394 F.3d 1189, 1194 (9th Cir. 2005) (adopting the "close nexus" test from In re Resorts Int'l, Inc., 372 F.3d 154, 166-67 (3rd Cir. 2004) because it recognizes the limited nature of post-confirmation jurisdiction but retains the flexibility which can be important in cases with continuing trusts; holding claims and remedies that could affect the implementation and execution of the confirmed plan had a sufficiently close nexus to the bankruptcy proceeding to uphold related to jurisdiction). (Hereafter, Pegasus Gold.) Matters

*Memo. Decis. Barton*                    -24-

affecting the interpretation, implementation, consummation, execution, or administration of a confirmed plan will typically have the requisite close nexus for "related to" jurisdiction. See also Wilshire Courtyard v. Cal. Franchise Tax Bd. (In re Wilshire Courtyard), 729 F.3d 1279, 1289 (9th Cir. 2013)(affirming use of the close nexus test stated in Pegasus Gold for post-confirmation litigation in a reopened case of a partnership debtor requiring interpretation of tax aspects of a confirmed plan *vis a vis* debtor's partners).

Continental argues that the Coverage Complaint concerns only application of the Policies - pre-petition contracts - to the Tendered Claims which is governed by Illinois law; therefore, the Coverage Complaint does not involve any actions by the Trustee and is not a core proceeding. Continental recognizes that the appropriate test for post-confirmation "related to" jurisdiction is stated in Pegasus Gold. Nonetheless, Continental argues that there is no "related to" jurisdiction for the Coverage Complaint because its resolution will not require the interpretation, implementation, or execution of the Plan.

The Court acknowledges that an insurance coverage dispute may not be core. See Matter of United States Brass Corp., 110 F.3d 1261 (7th Cir. 1997) (finding insurance coverage case was non-core); Ace Insurance Co., Ltd. v. Smith (In re BCE West, L.P.), 2006 WL 8422206, at *8 (D. Az. Sept. 20, 2006) (finding an insurance coverage dispute involving a post-petition breach of a pre-petition contract was a non-core proceeding); cf. United States Lines, Inc. v. American S.S. Owners Mut. Protection & Indem. Ass'n (In re United States Lines, Inc.), 197 F.3d 631 (2d

*Memo. Decis. Barton*                    -25-

Cir. 1999) (finding coverage complaint was core because of "pay first" structure of insurance policies).

Seen in isolation, a court might see a coverage complaint as non-core. But viewing the Coverage Complaint in isolation is inappropriate and the Court declines Continental's invitation to do so. As the Ninth Circuit pointed out in <u>Wilshire Courtyard</u> "the <u>Pegasus Gold</u> 'close nexus' test requires particularized consideration of the facts and posture of each case, as the test contemplates a broad set of sufficient conditions and retains a certain flexibility. Such a test can only be properly applied by looking at the whole picture." 729 F.3d at 1289 (internal citation and quotation marks omitted). The "whole picture" here requires acknowledging that coverage issues were raised in Continental's Proof of Claim; by agreement, a way for Continental to satisfy its coverage obligations was incorporated into the Plan; when litigation with the Trust began, Continental raised the coverage issues in its Answer and Counterclaim, and in its motion for summary judgment.[12]

Based on the foregoing, the Court concludes that it has "related to" jurisdiction to resolve the issues raised in the Coverage Complaint. These issues are inextricably intertwined with the Plan, the Confirmation Order, the TDP and the Liquidating Trust Agreement and significantly overlap with the issues raised, and poised to be decided, in the §155 Motion.

_____

[12] Continental's conduct in the Adversary Proceeding may also support a finding that it has consented to this Court's jurisdiction over any coverage issues. <u>See</u> <u>Wellness Int'l Network, Ltd. v. Sharif</u>, 135 S.Ct. 1932, 1942 (2015) (litigants may validly consent to adjudication by bankruptcy courts).

Resolution of these issues undeniably requires the interpretation and implementation of these documents as well as the Court's summary judgment ruling. Also, as pointed out in Wilshire Courtyard, interpretation of the Plan is the only way for a court to determine the essential character of the negotiated Plan transactions in a way that reflects the deal the parties struck in the chapter 11 proceeding. 729 F.3d at 1290. This is reason enough for the Court to exercise jurisdiction in this case.

Continental contends that §16.19, §16.20 and §8.3 of the Plan preserved its right to pursue a coverage litigation in state court. But Continental also takes the inconsistent position that the Coverage Complaint raises no issues regarding the interpretation, implementation, or execution of the Plan. If the Coverage Complaint were to proceed in state court, there is certainly a risk that Continental would ask the state court to agree with its interpretation of these sections of the Plan. This is not a risk the Trustee should be exposed to, nor should he be put to the task of explaining bankruptcy jurisdiction to a state court.

A confirmed plan operates as a final judgment with res judicata effect. Unsec. Cred's Comm. v. Southmark (In re Robert L. Helms Const. & Dev. Co., Inc.), 139 F.3d 702, 704 (9th Cir. 1998). A plan proponent has broad latitude in drafting a plan. See generally Bankruptcy Code §1123(b)(3)(A)-(B); The Alary Corp. v. Sims (In re Assoc. Vintage Group, Inc.), 283 B.R. 549, 560 (9th Cir. BAP 2002) (describing chapter 11 as essentially a structured negotiation; discussing estoppel issues). In this case, the Plan contained an agreed upon streamlined method for

Case: 01-45483    Doc# 586    Filed: 08/24/17    Entered: 08/25/17 08:14:59    Page 27 of 39

Continental to review Tendered Claims and to provide its coverage
 – that is – to pay the Trust. The Plan also preserved
Continental's right to contest coverage according to §8.3(b). The
so-called "insurance neutrality" provisions of the Plan do not
provide the broad escape path that Continental posits. In short,
if it is allowed to proceed, the Coverage Complaint is, in
effect, a collateral attack on the confirmation order. See also
Lauren Assoc. v. Morton Reed (In re California Litfunding), 360
B.R. 310, 312 (Bankr. C.D. Cal. 2007) (bankruptcy court has core
jurisdiction over action collaterally attacking confirmation
order).

Finally, the Coverage Complaint raises issues regarding the
*actions* of the Trustee in administering the estate for the simple
reason that it seeks to *stop* the Trustee from taking the actions
he is required to take and impedes his ability to finally resolve
the §155 issues that remain pending in the Adversary Proceeding.
Allowing Continental to litigate the Coverage Complaint outside
this Court interferes with the Trustee's performance under the
Plan and interferes with this Court's duty to supervise the
Trustee's performance of these duties. The *Barton* doctrine is
designed to protect against this. The Coverage Complaint seeks to
derail the Trustee's efforts to obtain payment from Continental
under the terms to which Continental agreed, and if it proceeds,
it allows Continental to avoid the binding provisions of the Plan
and jeopardizes a benefit negotiated in the Plan. This factor
weighs strongly in favor of denying the Motion.

//

//

Case: 01-45483   Doc# 586   Filed: 08/24/17   Entered: 08/25/17 08:14:59   Page 28 of 39

**3. Whether the claims involve the Trustee acting within the scope of his authority so that the Trustee is entitled to derived judicial immunity.**

Continental argues the Trustee is not entitled to quasi-judicial immunity "because it attaches only to those functions essential to the authoritative adjudication of private rights to the bankruptcy estate" and only applies to claims arising from a trustee's functions relating to the administration of the estate. Curry v. Castillo (In re Castillo), 297 F.3d 940, 951 (9th Cir. 2002). Continental asserts that administration of an estate does not include liquidating estate assets, citing Fed'l Ins. Co. v. Glen Ivy Management Co. (In re Glen Ivy Resorts, Inc.), 171 B.R. 98, 102-03 (Bankr. C.D. Cal.1994). This case is not binding and does not actually stand for this proposition. See also Crown Vantage, 421 F.3d at 972 (stating liquidating assets is precisely the type of activity that the *Barton* doctrine was designed to protect).

Continental also argues there is no immunity here because Continental does not seek any relief at all *against* the Trustee, it seeks only a declaration of non-coverage. To the contrary, judicial immunity is available to suits seeking declaratory relief. See Mullis v. U.S. Bankruptcy Court for Dist. of Nevada, 828 F.2d 1385 (9th Cir. 1987) (holding that the quasi-judicial immunity available to federal officers is not limited to immunity from damages, but extends to actions for declaratory, injunctive and other equitable relief).

In Castillo a chapter 13 trustee had mis-calendared the confirmation hearing and had failed to give notice of the confirmation hearing. The chapter 13 debtor wanted to sue the

*Memo. Decis. Barton*                    -29-

trustee for damages when, as a result of these mistakes, her home was sold at a foreclosure sale. Castillo, 297 F.3d at 944. The Ninth Circuit held that the chapter 13 trustee enjoyed absolute quasi-judicial immunity for scheduling and noticing the confirmation hearing. Castillo, 297 F.3d at 952. The Ninth Circuit pointed out that in Antoine v. Byers & Anderson, Inc., 508 U.S. 429 (1993) the Supreme Court "announced that absolute quasi-judicial immunity will be extended to nonjudicial officers only if they perform official duties that are functionally comparable to those of judges, i.e., duties that involve the exercise of discretion in resolving disputes." Id. at 949. In Antoine, the Supreme Court held that a court reporter did not enjoy this immunity from suit for failing to provide a transcript of a criminal trial; this was a task that did not involve the exercise of discretion. Antoine, 508 U.S. at 435.

    In order to determine whether immunity was appropriate for the chapter 13 trustee, the Castillo court first inquired as to the immunity historically accorded a bankruptcy trustee. "The common-law and nineteenth century antecedents of the modern bankruptcy trustee were entrusted with both administrative and adjudicatory functions. To the extent the trustee performed the functions of a modern-day bankruptcy judge, immunity would have extended to the performance of these common-law adjudicatory functions." 297 F.3d at 950. The Bankruptcy Code now defines the role of a chapter 13 trustee. Essentially, the chapter 13 trustee gathers and liquidates the property of the estate, is accountable for the estate, ensures the debtor performs his or her obligations, investigates the finances of the debtor, reviews

proofs of claims, opposes discharge where appropriate, prepares a
final report and an accounting. See Bankruptcy Code §704, §1302.
In short, the chapter 13 trustee has both administrative duties
and adjudicatory functions and immunity attaches only to those
functions essential to the authoritative adjudication of private
rights to the bankruptcy estate. Id. at 951, citing Antoine, 508
U.S. at 433.

The Castillo court then considered whether the particular
functions at issue in the case - calendaring and noticing the
confirmation hearing - involved the exercise of discretionary
judgment. Id. at 947. The court concluded that the ultimate act
was the scheduling and convening of an adjudicatory hearing, an
"act that neatly meets the definition of a judicial function."
Id. at 952.

In applying this approach here, the Plan, the Liquidating
Trust Agreement, and the TDP guide the Court's analysis. The Plan
provisions described above identify the Trustee's duties and the
scope of his authority. Like any bankruptcy trustee, the Trustee
in this case has both administrative and judicial functions. He
reviewed Asbestos Claims and liquidated them pursuant to the
terms of the TDP, he filed a motion seeking their allowance and
disallowance and approval of his audit procedures. These were
judicial functions that involved the exercise of discretionary
judgment. He tendered claims to Continental that triggered its
Policies under controlling Illinois law and then filed the
Adversary Proceeding to resolve the Trust's dispute with
Continental. These were also judicial functions that required the
exercise of his discretionary judgment. Because the Coverage

Case: 01-45483   Doc# 586   Filed: 08/24/17   Entered: 08/25/17 08:14:59   Page 31 of
39

Complaint implicates these same functions, the Trustee is immune from suit in state court. This factor weighs in favor of denying permission to sue the Trustee in state court.

### 4. Whether the party seeking to surcharge the Trustee or seeks a judgment against the Trustee personally.

The Coverage Complaint does not seek a judgment against the Trustee personally. This factor does not outweigh the factors that support denying leave to sue in state court.

### 5. Whether the claims involve breach of fiduciary duty.

The Coverage Complaint does not raise any breach of fiduciary duty issues. This factor does not outweigh the factors that support denying leave to sue in state court.

## IV. Judicial and Equitable Estoppel

The Trustee also argues that the doctrines of judicial and equitable estoppel provide another basis to deny Continental's request to begin new litigation against the Trustee. Both parties have briefed the estoppel issues in connection with the §155 Motion and have incorporated their arguments here. Because these issues are treated extensively in the §155 Motion, and the Kashani factors provide the pertinent analysis for the *Barton* issues, the Court will treat the estoppel arguments in summary fashion here.

### A. Judicial Estoppel

Federal law governs the application of judicial estoppel in federal courts. Milton H. Greene Archives, Inc. v. Marilyn Monroe LLC, 692 F.3d 983, 992 (9th Cir. 2012); Risetto v. Plumbers and Steamfitters Local 343, 94 F.3d 597, 603 (9th Cir. 1996). Judicial estoppel's purpose is to protect the integrity of the

*Memo. Decis. Barton* -32-

judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment. <u>New Hampshire v. Maine</u>, 532 U.S. 742, 749 (2001). The factors that typically inform a decision to apply the doctrine in a particular case were described in <u>New Hampshire v. Maine</u>: First, a party's later position must be clearly inconsistent with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or second court was misled. The third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. <u>Id.</u> at 750-51. The Supreme Court cautioned that these were not inflexible prerequisites or an exhaustive formula for determining applicability of judicial estoppel and additional considerations may inform its application in specific contexts. <u>Id.</u> at 751.

The Trustee argues that Continental's first position was that it had lost on the coverage issues and a judgment should be entered against it. Continental said the factual and legal issues under §155 that remained – whether there was vexatious and unreasonable delay, the appropriate amount of attorneys' fees, the amount of the statutory penalty under §155 – could be determined on the briefs and no trial was necessary. Continental persuaded both the Trustee and the Court to adopt this position. Now Continental wants to be permitted to go to state court to litigate coverage issues which it claims have never been raised

Case: 01-45483   Doc# 586   Filed: 08/24/17   Entered: 08/25/17 08:14:59   Page 33 of 39

or considered by this Court. This is clearly an inconsistent position - and an inaccurate one - as it pertains to the coverage issues never having been raised or considered here. If Continental is permitted to start over in state court, Continental derives an unfair advantage by prolonging its ability to stall paying valid claims and by avoiding its obligations under the Plan. The Trust (and its beneficiaries) will suffer an unfair detriment from the expense and delay this proposed state court litigation will impose.

Continental argues it has never taken any inconsistent position as to the "trigger of coverage" and the only position it took was that a trial date was not necessary. Continental now claims it took this position because this Court does not have jurisdiction over coverage issues. Continental insists this Court did not rely on any position it advanced, again narrowing this to a position regarding the determination of coverage, because no evidence on this topic has ever been presented to the Court. Continental also argues it is not going to derive an unfair advantage or impose an unfair detriment on the Trustee if a case proceeds in state court because the Trustee has always had an obligation to establish the Tendered Claims are covered. Continental also claims any inconsistency in its prior positions - described as the "off-the-cuff remarks" of its counsel trying to be cooperative and efficient rather than misleading - were based on inadvertence or mistake so estoppel is not appropriate. See Johnson v. Oregon, 141 F.3d 1361, 1369 (9th Cir. 1998) (discussing judicial estoppel, pointing out that if incompatible positions are based on inadvertence or mistake they may not

*Memo. Decis. Barton*                    -34-

support judicial estoppel).

The Trustee is correct regarding the application of judicial estoppel to the facts before the Court. Applying the approach as instructed in New Hampshire v. Maine, Continental is judicially estopped from proceeding in state court with its Coverage Complaint. Continental's counsel told this Court on many occasions, and in no uncertain terms, that Continental "had lost" and judgment should be entered against it and in favor of the Trust. The judgment prayed for in the First Amended Complaint was for the remaining coverage under Continental's Policies. Counsel's statements were not "off-the-cuff remarks" as Continental's revisionist history would have it.[13] The Court understood them as an unequivocal concession that Continental was prepared to have judgment entered against it on its coverage obligations - that is, a judgment for its remaining Policy limits. Viewed in context, these statements were not made because Continental believed this Court lacked jurisdiction. The Court and the Trustee both relied on these statements in the course of litigating the Adversary Proceeding and took these statements at face value: Continental had agreed it would pay its Policy limits to the Trust. If Continental proceeds in state court, it will no doubt downplay the significance of its counsel's statements, or

---

[13] The Court also notes litigants are bound by the conduct of their attorneys absent egregious circumstances which are not present here. See Anderson v. Air West, Inc., 542 F.2d 522, 526 (9th Cir. 1976) (plaintiff may not benefit from her attorney's failure to complete service of process, leniency for plaintiff in the face of actual prejudice to the other parties would permit her to benefit).

*Memo. Decis. Barton*                    -35-

deny these statements were made. Litigation in state court will also impose an unfair delay on the beneficiaries of the Trust and an unwarranted expense on the Trustee and his counsel to their detriment and the detriment of the Trust's beneficiaries. Either this Court was misled or a state court will be misled if this succeeds. This is both unfair to the Trustee and is an affront to this Court and the integrity of the judicial process.

**B. Equitable Estoppel**

Continental argues equitable estoppel is analyzed under Illinois law.[14] Under Illinois law, equitable estoppel requires demonstration by clear and convincing evidence that (1) one party's words or conduct amount to a misrepresentation or concealment of material facts; (2) that party knows that the representations are untrue at the time they are made; (3) the other party did not know that the representations were untrue when they were made and acted upon; (4) the party to be estopped intended or reasonably expected that the other party would act upon the representations; (5) the party claiming estoppel reasonably relied upon the representations in good faith and to its detriment; and (6) the party claiming estoppel would be prejudiced by its reliance on the representations if the other party were permitted to deny their truth. The party claiming estoppel does not need to show that the other party intentionally misled or deceived it; it is sufficient that a fraudulent or unjust effect results from allowing another person to raise a

---

[14] California law is essentially the same. See <u>City of Goleta v Superior Court</u>, 40 Cal. 4th 270, 279 (2006).

Case: 01-45483   Doc# 586   Filed: 08/24/17   Entered: 08/25/17 08:14:59   Page 36 of 39

claim inconsistent with his or her former declarations. <u>Falcon Funding, LLC v. City of Elgin</u>, 399 Ill.App.3d 142, 157-58 (2010) (relying on and summarizing Illinois Supreme Court cases including <u>Geddes v. Mill Creek Country Club, Inc.</u>, 196 Ill.2d 302, 313-14 (2001).

Continental argues that none of these elements are present here. It asserts that its counsel did not misrepresent anything, or intend to mislead, he simply made certain statements in an effort to be "creative in ways to manage" the case and did not make any statements which he believed to be untrue when he made them. AP Docket no. 125-2, Declaration of Raymond J. Tittman, ¶17. He tried to correct these statements in March 2017 based on asserted "newly discovered evidence" regarding the merits of the Tendered Claims. As to the third element, Continental argues the Trustee "had more information about the claims than Continental and must know that most, if not all, of the tendered claims do not trigger the Continental 1985-1987 policies." AP Docket no. 125, p. 18:5-8. The Court finds this last statement deeply troubling. It insinuates that the Trustee is trying to defraud Continental into paying Tendered Claims. This sort of underhanded attack on a fiduciary is unwarranted and disgraceful. While it is not necessary to rely on equitable estoppel to deny this Motion, it does add support to the outcome.

**V. Conclusion**

Continental first violated the *Barton* doctrine by filing a complaint in Illinois state court. It dismissed that first complaint only in response to the order to show cause. Continental does not believe it needs this Court's permission to

*Memo. Decis. Barton*                    -37-

proceed in state court, and only reluctantly asks for permission. For the reasons explained above, the Court exercises its discretion to deny Continental permission to file its Coverage Complaint.

Resolving the Trustee's declaratory relief and breach of contract claims is integral to the Court's ability to preserve and equitably distribute the Trust's assets according to the Plan. The purpose of *Barton* doctrine is to protect the Trustee in the pursuit of these actions. It would be manifestly unfair to sidetrack the Trustee with this state court litigation that would almost certainly impede his progress toward wrapping up this sixteen year old chapter 11 case. Accordingly, the Motion is denied. A separate order will follow.


*** End of Memorandum Decision ***

*Memo. Decis. Barton*                    -38-

1    <u>Court Service List</u>:

2

3    Service on all parties by ecf

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Memo. Decis. Barton*                              -39-